UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 18-CR-00112 (5) & (6)** |
| **VERSUS** | * | **JUDGE DRELL** |
| **ANTONIO ZARATE (6) BALDOMERO VELASCO CASTRO (5)** | * | **MAG. JUDGE WHITEHURST** |

## REPORT AND RECOMMENDATION

Pending before the Court is a Motion to Suppress (Doc. 158), filed by defendant Antonio Zarate ("Zarate") on January 10, 2019. On February 20, 2019, co-defendant Baldomero Velasco Castro ("Velasco") filed a Motion to Adopt the motion to suppress filed by Zarate [Doc. 164], which was granted by the Court [Doc. 165]. The government opposed the motion [Doc. 161], and Velasco filed a reply brief [Doc. 189]. The motions were referred to the undersigned for review, report and recommendation in accordance with the provisions of 28 U.S.C. § 636 and the standing orders of this Court.

An evidentiary hearing was conducted on March 29, 2019. Testifying for the government were Agent Larry McCook of the Drug Enforcement Administration and Officers John Malveaux and Lam Bui of the Lafayette Sheriff's Department. Additionally, prior to the hearing, the government admitted into evidence, without objection, the body camera video and audio recordings of the traffic stop in question.

Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, it is recommended that the Motion to Suppress be **DENIED**.

## *I. Factual Background*

The testimony of DEA Special Agent Larry McCook and Lafayette Sheriff's Deputies John Malveaux and Lam Bui provided the following facts:

Special Agent McCook testified that he was and still is the case agent in this matter and has been involved since late 2017 in a joint state and federal investigation of co-defendant Randy Guajardo and his alleged drug trafficking organization. During this investigation, law enforcement developed a confidential source (CS) who communicated with Guajardo daily. According to Agent McCook, numerous telephone calls and text messages among Guajardo, the CS, an undercover officer (UC), and other members of the alleged drug-trafficking organization were intercepted and recorded.

Agent McCook testified that from March 15, 2018 until March 18, 2018, Guajardo and the CS participated in recorded telephone conversations in which they discussed the transportation of eight kilograms of cocaine from Nashville, Tennessee to Lafayette, Louisiana via bus.[1] Based on Guajardo's conversations and an

---

[1] Agent McCook testified that, although Guajardo discussed alternate routes and delivery locations, as well as other means of delivery, the ultimate agreement was for the eight kilograms of cocaine to be delivered by bus from Nashville to Lafayette.

investigation into the bus schedules, law enforcement were able to identify the actual bus which was being used in the transport. Law enforcement were also able to determine that there may be multiple couriers involved in the delivery.[2] According to Agent McCook, the communications by Guajardo, the UC, the CS, and co-defendant Charles Brown indicated to law enforcement that the bus had been delayed in Mobile, Alabama. The conversations further revealed that Charles Brown and co-defendant Abel Morales had traveled from Houston to Lafayette to accept the delivery of cocaine from the couriers at the Best Western on Evangeline Thruway. Agent McCook testified that law enforcement had determined that Brown was driving a white Dodge Durango, which was observed through surveillance at that Best Western.

Agent McCook further testified that law enforcement established surveillance at the bus terminal and observed that the bus arrived at the terminal and dropped off approximately 20 passengers. Surveillance officers noticed two individuals, later identified as Zarate and Velasco, engaging in what Agent McCook described as suspicious behavior as they retrieved their bags from the bus and that they were looking around in an attempt to locate someone. He indicated that they briskly walked to meet an individual who was waiting in the parking lot in a black Nissan

---

[2] Agent McCook specifically recalled a conversation between co-defendant Charles Brown and the UC wherein Charles Brown referred to couriers as "*these boys*" when discussing a delay involving their bus.

Maxima registered to an address in Leesville, Louisiana which is located approximately 1 ½ hours away from Lafayette. Agent McCook testified that at the time surveillance was initiated, law enforcement did not notice the Uber sticker in the vehicle. He did note, however, that the driver was waiting outside of his vehicle near the door jam, rather than inside. According to McCook, based on these facts, as well as on the time of the morning and the behavior of the defendants, law enforcement became suspicious that this was a planned meeting place as opposed to an Uber fare.

McCook testified that they decided to follow the defendants as they left the bus terminal so they could continue to conduct surveillance on them. According to McCook, they also conducted surveillance on other individuals who exited the bus and left the bus station. This action was taken to establish whether they had any involvement.[3]

During mobile surveillance of the defendants, law enforcement followed the Maxima to a Best Western located on Kaliste Saloom Road in Lafayette. McCook stated that law enforcement observed one of the individuals exit the vehicle, enter the Best Western for a short time, exit the Best Western, and reenter the vehicle. The

---

[3] McCook's testimony indicated that law enforcement eventually determined that these individuals' actions did not appear to be in conjunction with Guajardo's alleged drug trafficking operation, so they eliminated them as possible targets or suspects.

vehicle then proceeded on its route to the Evangeline Thruway.[4] Law enforcement then observed the Maxima turn onto Evangeline Thruway in the direction of the Northside Best Western which had previously been identified as the place where the couriers were to meet co-defendants Charles Brown and Abel Morales. According to Agent McCook, this action gave them reason to believe that defendants were involved in the drug transaction with co-defendants Guarjardo, Brown and Morales which had been discussed on the wire tap surveillance. Based on these suspicions, Agent McCook authorized a stop of the vehicle.

Officer John Malveaux testified that at the time in question, he was a member of the Lafayette Metro Narcotics Task Force (LMNTF) Street Team.[5] He explained that he was on duty on the evening of March 16, 2018 and in the early morning hours of March 17, 2018. According to Officer Malveaux, on March 16, 2018, he was briefed by his sergeant that DEA was conducting an operation and that they might need assistance conducting a traffic stop on a vehicle. While still conducting his duties with LMNTF, Officer Malveaux continued to receive updates via radio traffic regarding the operation. Officer Malveaux testified that he was instructed by his supervisor to maintain his location near the bus station and await further updates and

---

[4] Agent McCook testified that the vehicle also turned into a Wyndham hotel off of Pinhook Road prior to driving to the Best Western.

[5] The LMNTF Street Team has since been disbanded.

instructions. Officer Malveaux testified that he received information that surveillance had been conducted on a black Nissan Maxima which left the bus station with two Hispanic male subjects and that there was a possibility that the vehicle was transporting the large quantity of cocaine which was the subject of the investigation. Officer Malveaux was provided with the license plate of the vehicle and was instructed to follow the vehicle and attempt to stop the vehicle if he observed a traffic violation that developed into probable cause. Officer Malveaux began to follow the vehicle after it turned onto Evangeline Thruway. According to Officer Malveaux, he observed the vehicle cross the center line on two occasions, which is a violation of Louisiana Revised Statute 32:71. Officer Malveaux activated his emergency lights and conducted a traffic stop of the vehicle.

Upon initiating the stop, Officer Malveaux made contact with the driver and advised him of the traffic violation. According to Officer Malveaux, the driver explained that he may have been adjusting his directions because he was an Uber Driver, and was attempting to find the location that his passengers requested. Officer Malveaux requested the driver's license, registration and proof of insurance. While Officer Malveaux was questioning the driver, K-9 handler Lam Bui arrived at the scene with his K-9. Corporal Ross Sonnier, Sergeant Beau Guidry, and Corporal Fred Payne, who were all members of the street team, also arrived on the scene.

Officer Malveaux testified that he requested and received consent from the driver to search the vehicle in furtherance of the narcotics investigation. At the time he received consent to search the vehicle, Officer Malveaux had run the driver's license on his mobile data terminal but was still awaiting information from dispatch regarding any outstanding warrants.

Officer Bui testified that on the night in question, he was also assigned to the operation investigating the alleged transportation of cocaine from another state to Lafayette by two individuals traveling by bus. He, like Officer Malveaux, was assigned to patrol the area near the bus station. Officer Bui confirmed Officer Malveaux's testimony that he assisted after Officer Malveaux conducted a traffic stop of the Maxima. Officer Bui stated that he made contact with a backseat passenger (one of the defendants) and advised him of the reason for the stop and questioned him regarding the purpose of their travel.[6] Following this questioning and while the consensual search of the vehicle was ongoing, Officer Bui requested and received consent from Zarate and Velasco to search their belongings – two black suitcases which had been located in the trunk. Prior to the consensual search of the luggage,

---

[6] This testimony is confirmed by the body camera video and audio which was admitted and made part of the record prior to the hearing. The video also shows another officer questioning the front seat passenger while Officer Bui questioned the rear passenger. The video/audio further shows that one of the defendants admitted to the officers that they had been traveling by bus, which had been delayed, and that they were on route to the Best Western at the time of the stop.

Zarate and Velasco claimed ownership of the luggage in the trunk. During the search of both suitcases, law enforcement located suspected cocaine.

## *II. Discussion*

The defendants move to suppress the cocaine found in the two suitcases that were searched without a warrant as a result of the traffic stop that occurred in the early morning hours of March 17, 2019 on the basis that such evidence was obtained in violation of the defendants' Fourth Amendment rights. The defendants appear to challenge both the legality of the initial stop of the vehicle, as well as the impermissible extension of the duration of the traffic stop without additional reasonable articulable suspicion. *R. 158, 189.*

The government contends that Officer Malveaux conducted a valid traffic stop of the black Nissan Maxima based on his observance of a traffic violation committed by the driver – specifically, improper lane usage. According to the government, the subsequent search of the vehicle and the defendants' luggage was conducted pursuant to the knowing and voluntary consent of the driver, as well as the defendants. The government also contends that the duration of time between the initiation of the traffic stop until consent was granted and contraband was recovered was reasonable and supported by additional suspicion of criminal activity. Finally, the government contends that regardless of the traffic violation, the officers had probable cause to

stop the vehicle based on the information obtained during their investigation into Guajardo's drug trafficking organization. *R. 161*.

The Fourth Amendment guarantees individuals the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. The general purpose of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *United States v. Garza*, 921 F.2d 59, 60 (5th Cir.1991) (citing *Camara v. Municipal Court of the City and County of San Francisco*, 387 U.S. 523, 528 (1967)).

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). Searches conducted without a warrant, however, are per se unreasonable under the Fourth Amendment, subject only to a few specifically established and well-delineated exceptions. *Katz v. United States,* 389 U.S. 347, 357 (1967). When the government searches or seizes a defendant without a warrant, the government bears the burden to show that the search falls within one of the exceptional situations justifying the search and is, therefore, constitutional. *Vale v. Louisiana,* 399 U.S. 30, 34 (1970).

It is well-settled that police officers may stop a vehicle for a traffic violation.

*Whren v. United States*, 517 U.S. 806, 819 (1996) (affirming a traffic stop based on the officer's observation that the driver had unlawfully turned without signaling). "[S]o long as a traffic law infraction that would have objectively justified the stop ha[s] taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *United States v. Harris*, 566 F.3d 422, 434 (5th Cir. 2009). Additionally, after stopping a vehicle, an officer may order the driver and passenger out of the vehicle. *Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (passenger); *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1997) (driver). The officer may ask for consent to search the car and need not tell the driver he is free to go before asking for consent. *Ohio v. Robinette*, 519 U.S. 33, 34 (1996).

The legality of traffic stops for Fourth Amendment purposes is analyzed under the standard established by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Brigham*, 382 F.3d 500, 506 (5th Cir.2004) (*en banc*). Under the *Terry* analysis, the legality of a traffic stop is tested in two parts. *Id*. First, the Court determines whether the stop of the vehicle was justified at its inception. *Id*. Second, the Court determines whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place. *Id*.

Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop

context is determined by the seizure's "mission" – to address the traffic violation that warranted the stop and attend to related safety concerns. *See United States v. Sharpe*, 470 U.S. 675, 685 (1985); *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because addressing the infraction is the purpose of the stop, it may "last no longer than is necessary to effectuate th[at] purpose." *Ibid*. *See also Caballes*, 543 U.S., at 407, 125 S.Ct. 834. Authority for the seizure thus ends when tasks tied to the traffic infraction are – or reasonably should have been – completed. *Sharpe*, 470 U.S., at 686 in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"). Should reasonable suspicion of other criminal activity arise before the ordinary incidents of a traffic stop are completed, however, an officer may continue detaining a motorist for as long as reasonably necessary to confirm or dispel that suspicion. *See United States v. Pack*, 612 F.3d 341, 350 (5th Cir. 2010).

Among the ordinary incidents of a traffic stop are examining drivers' licenses and vehicle registrations, and proof of automobile insurance; running computer checks; determining whether there are outstanding warrants against the driver; and asking the purpose and itinerary of the trip. *Id*. The Fifth Circuit has never required officers conducting a traffic stop to follow any prescribed script, as "detention, not questioning, is the evil at which *Terry*'s second prong is aimed." *United States v.*

*Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993); *see also United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001). Additionally, there is "no constitutional stopwatch on traffic stops." *Brigham*, 382 F.3d at 511 (5th Cir. 2004). "Instead, the relevant question in assessing whether a detention extends beyond a reasonable duration is 'whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id*.

Police do not need a warrant to search the vehicle if a person with apparent authority consents to a search. The consent must be knowing and voluntary and not the product of coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973). Additionally, police do not need reasonable suspicion or any other justification to ask for consent. *Royer*, 460 U.S. at 491. The person can have "actual authority " to consent (by having joint access or control), *United State sv. Matlock*, 415 U.S. 164, 171 (1974), but all that is required is that at the time of the search, the officers had reason to believe the person had "apparent authority" to consent. *Ilinois v. Rodriguez*, 497 U.S. 177, 188 (1990); *Georgia v. Randolph*, 547 U.S. 103, 109 (2006).

Officer Malveaux testified that he stopped the vehicle in question for improper lane usage after observing the driver cross the center line twice on Evangeline Thruway. Accordingly, Officer Malveaux had reasonable suspicion that a traffic violation had occurred and the initiation of the stop was, therefore, justified.

The undersigned further finds that the traffic stop itself did not last an

unreasonably long time. During the stop, Officer Malveaux requested and received consent from the driver to search the vehicle.[7] This consent was obtained while Officer Malveaux was still awaiting information from dispatch concerning any outstanding warrants. Thus, at the time the driver gave consent to search his vehicle, Officer Malveaux was still in the process of effectuating the purpose of the stop and was engaged in a task which is considered an ordinary incident of a traffic stop.

While the officers were searching the vehicle pursuant to the consent given by the driver, Officer Bui received consent from Zarate and Velasco to search their suitcases which had been located in the trunk of the vehicle during the search.[8] The requests for consent and the consent given were recorded on the officers' body cameras. The consent interaction took approximately 6 minutes from the time the body camera recording was initiated which occurred after the officers exited their vehicles.[9] Thus, the consent of both the Uber driver and the defendants themselves led to the discovery of the cocaine in this matter, therefore; the undersigned finds that sufficient consent was given for the search of the luggage, and any argument that the

---

[7] The Uber driver had a possessory interest in his vehicle and, therefore, had both actual and apparent authority to consent to the search of his vehicle.

[8] Zarate and Velasco both admitted to the officers that the suitcases located in the trunk of the vehicle belonged to them and, therefore, had actual and apparent authority to consent to the search of their luggage.

[9] According to the testimony, Officer Bui arrived at the scene immediately after Officer Malveaux conducted the stop and activated his camera when he got out of his unit.

consent given was insufficient to justify the search is without merit.[10]

The Court further agrees with the government that the officers had probable to search it and the defendants' suitcases, based on the substantial information the government had obtained through the investigation of the drug transaction involving the transportation of a large amount of cocaine from Nashville to Louisiana. Agent Larry McCook testified at length regarding the investigation which included the use of wire taps, surveillance, an undercover officer and a cooperating source. Through the investigation, law enforcement were able to identify the actual bus being used in the transport and had determined that it was likely that multiple couriers were involved. Law enforcement were also able to determine that co-defendants Charles Brown and Able Morales had traveled from Houston to Lafayette to accept the delivery of the cocaine from the couriers at the Best Western on Evangeline Thruway.

During surveillance of the bus terminal, law enforcement observed Zarate and Velasco exit the bus and get into the black Nissan Maxima which had been waiting in the parking lot and which was registered to an address 1/12 hours from Lafayette. Based on their suspicions of the defendants' actions, law enforcement decided to conduct further surveillance of the vehicle. During that surveillance, law enforcement observed that the vehicle briefly stopped at a Best Western located on Kaliste Saloom

---

[10] Neither defendant has argued, nor does this court find, that the consent given in this case was involuntary or in any other way coerced.

and then continued on to Evangeline Thruway in the direction of the Northside Best Western. This location had previously been identified as the place where the couriers were to meet Brown and Morales to deliver the cocaine. At that point, having eliminated as suspects the other individuals who they had surveilled leaving the bus station, the DEA had reason to believe that the defendants were the couriers of the cocaine that was the subject of their investigation and, therefore, had probable cause to search the defendants' bags.[11] It is settled that police may search an automobile and the containers within it without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity. *California v. Acevedo,* 500 U.S. 565, 580 (1991). Accordingly, in addition to consent, the search of the defendants' suitcases is justified on the basis of probable cause.

The line of questioning pursued by defense counsel at the hearing suggests that the defendants are arguing that the movants were subjected to racial profiling at the bus station, when law enforcement identified them as the potential couriers. However, Agent McCook testified that individuals other than the movants were pursued as possible couriers and were the subject of surveillance once they disembarked the bus. Accordingly, the undersigned concludes the defendants'

---

[11] During the stop but prior to the search of the defendants' luggage, one of the defendants admitted to the officers that they were on route to the Best Western hotel. This information confirmed the information law enforcement had obtained during the investigation and bolstered the officers' probable cause to believe that the defendants were the couriers of the cocaine which had been discussed extensively over the wire tap.

apparent argument that they were subjected to racial profiling is essentially unsupported.

After consideration of this evidence and argument, the undersigned concludes that the traffic stop lasted for a reasonable duration and does not violate the principles of Terry. The vehicle was lawfully stopped after the driver committed a moving violation, which he acknowledged, consent was obtained for the search of both the vehicle and the luggage, and the stop did not last an unreasonably long amount of time. The search of the defendants' suitcases is further justified by probable cause developed by law enforcement after an extensive and thorough investigation of the drug transaction at issue.

### III. Conclusion

For the reasons set forth above, it is **RECOMMENDED** that the Motion to Suppress (Doc. 158) be **DENIED**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Cr. P. 59(b)(2), parties aggrieved by this recommendation have fourteen days from service of this report and recommendation to file specific, written objections with the Clerk of Court.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of its service, or on a date set by the district court,

shall act to waive the party's right to review by the district court. Fed. R. Cr. P. 59(b)(2).

**THUS DONE AND SIGNED** in chambers at Lafayette, Louisiana this 1st day of July, 2019.

_____
UNITED STATES MAGISTRATE JUDGE